UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.      ) | Case No. 3:17CR8 |
| ) | |
| JERMEL ANTHONY COLEMAN ) | Hon. Norman K. Moon |

### MOTION FOR COMPASSIONATE RELEASE IN LIGHT OF COVID-19 PANDEMIC

Mr. Coleman, through the undersigned counsel, now files this Motion for Compassionate Release based on the risk posed to him from the COVID-19 virus. Specifically, Mr. Coleman's conditions—chronic uveitis and viral pneumonia, as well as a history of hypertension—place him at a greater risk for serious complications resulting from the virus. Mr. Coleman is also at increased risk of contracting COVID-19 given the outbreak at FCI Ray Brook, where he is incarcerated. Mr. Coleman has exhausted his administrative remedies, and the section 3553(a) factors support his release. This Court should release him without delay.

### INTRODUCTION

By now, this Court is unfortunately familiar with the impact of the Covid-19 virus. There are over 1.9 million cases in the United States, and almost one hundred and ten thousand people in this country have died.[1] In Virginia alone,

---

[1] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (last visited June 5, 2020).

there are more than 48,000 cases and over 1,400 deaths.[2] . We have been told by the authorities to stay home, stay safe, and not be closer than six feet to anyone. Older persons, persons with weakened immune systems and those with underlying health problems need to take ever greater precautions because of the dangerous aspects of this particular virus.

Mr. Coleman suffers from several health conditions, both chronic and recent. *See* Ex. A, excerpts of medical records (filed under seal). He experiences chronic bouts of uveitis, an inflammation of the middle layer of tissue in the eye.[3] It can come on suddenly and worsen quickly without medical attention, and without proper treatment, it can lead to serious and permanent damage to the eye, including retinal detachment, optic nerve damage, and blindness.[4]

He has had a serious recurrence of his uveitis since at least March 3, 2020. His treatment note from that date indicates that the contract ophthalmologist would not be back at FCI Ray Brook until April. Ex. A, note March 3, 2020. He was later scheduled for an ophthalmology consult when the ophthalmologist returned, and prescribed prednisone eye drops. Ex. A, notes March 12, 2020, March 10, 2020. By mid-March, Mr. Coleman's vision had worsened to the point that he could only see light. Ex. A, note March 17, 2020. On March 26, however, his provider noted that his ophthalmologist appointment had been cancelled due to the pandemic. His BOP medical provider note from April 7, 2020 states:

---

[2] https://www.vdh.virginia.gov/coronavirus/ (last visited June 5, 2020).
[3] *What is uveitis*, https://www.mayoclinic.org/diseases-conditions/uveitis/symptoms-causes/syc-20378734
[4] *Id.*

> Inmate continues to complain about L eye visual changes from Uveitis. He was to have an Ophthalmologist evaluation but the Dr. cancelled it due to the Pandemic. The drops given to him (Prescribed by the Ophthalmologist over the phone) do not seem to be working. I called the University of Virginia Eye Center where the inmate states that he was cared for. The last appointment was 4/21/18 and he was seen by a Dr. Meagan Nichols a resident who has since left. All of the staff are currently working from home and cannot make appointments or have conferences due to the Pandemic. The nurse who responded to me from home stated that he had been given Durezol twice daily and was not followed up.
>
> I will attempt to order the medication from BOP.

Ex. A, Note dated 4/7/20.

Mr. Coleman received the medication shortly after that, but it did not have the hoped-for effect. Three weeks later, on April 28, 2020, his provider note states that he continues to have issues with his left eye, and that his eye showed some improvement when he was placed on high dose steroid drops, but began to worsen when they attempted to taper the dose. Ex. A, Note dated 4/28/20. Mr. Coleman reports that he was not actually seen for or questioned about the status of his eye that day.[5] He has not been seen by a provider again for his eye, and his vision has not improved. He is concerned that at this point, he may require eye injections or systemic steroids to treat the inflammation in his eye,[6] and he may require surgery to correct any damage such as a detached retina.

Unfortunately, FCI Ray Brook is a Level 1 medical facility, the lowest level

---

[5] While the treatment note for April 28 refers to the condition of his eye, he was seen that day to give a COVID-19 sample, and the treatment note appears to be based solely on the observation of the provider who took the sample.
[6] The National Eye Institute at the National Institute of Health lists vision loss as a "late symptom" of uveitis, and notes that steroidal anti-inflammatories may be taken as pills, injected into the eye, infused intravenously, or released within the eye through a surgical implant. *See* https://www.nei.nih.gov/learn-about-eye-health/eye-conditions-and-diseases/uveitis. However, long-term steroid use produces serious side effects, including diabetes, cataracts, glaucoma, heart disease, and weight gain. *Id.* If steroid treatments are ineffective, immunosuppressive drugs are often used as treatment. *Id. See also* Uveitis treatment, https://www.mayoclinic.org/diseases-conditions/uveitis/diagnosis-treatment/drc-20378739;

of care in the BOP system, designed for inmates who are generally healthy and "have limited medical needs that can be easily managed by clinical evaluations every 6-12 months."[7] As such, it does not appear equipped to handle Mr. Coleman's medical needs under the limitations imposed by the pandemic.

Mr. Coleman was also diagnosed with pneumonia in late April. Ex. A. While he was initially suspected of having COVID-19, he tested negative for the virus. However, he had a number of concerning respiratory symptoms including coughing and wheezing. A chest x-ray taken on April 27 showed pneumonia. Ex. A. Mr. Coleman reports that he is receiving no treatment, as he was told that because the illness was viral, there was nothing medical staff could do, and he was discharged from isolation and returned to his housing unit after 8 days. However, he continues to experience symptoms including fluid in the lungs. He has requested a second chest x-ray but has been told that he does not qualify for one.

By this emergency motion, Mr. Coleman seeks immediate release from FCI Ray Brook to serve the remainder of his custodial term in strict home detention. He seeks this relief pursuant to 18 U.S.C. § 3582, as modified by the First Step Act, and do so in order to protect his Eighth Amendment and Due Process rights. As discussed more fully below, Mr. Coleman is at risk of suffering serious consequences from the COVID-19 epidemic, both from the virus itself, and from the collateral effects of the virus, which are limiting his ability to receive appropriate treatment for his chronic and potentially debilitating uveitis.

---

[7] https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf

Mr. Coleman is currently incarcerated at FCI Ray Brook. Ray Brook is a medium security prison in northern New York with a detention center, housing 578 prisoners.[8] FCI Ray Brook has experienced a COVID-19 outbreak, with 20 positive cases reported.[9] While BOP reports that all of these cases have "recovered," there is reason to doubt that "recovery" is as definitive as it might appear on paper. For example, an inmate at FCI Terminal Island who had tested positive in April, and then been listed as "recovered," died on May 24.[10] This unfortunately squares with the data regarding death rates in BOP: while the number of confirmed positive inmates has hovered between 1,500 and 2,000 and the number of "recovered" inmates has risen, the number of inmate deaths has also continued to rise.[11]



---

[8] https://www.bop.gov/locations/institutions/rbk/. Interestingly, the prison was originally the Olympic Village from the 1980 Lake Placid Olympic Games. In addition, conditions at FCI Ray Brook, specifically overcrowding, are the basis for prisoner lawsuit in which a jury recently found for the plaintiff, an inmate, and a judge entered a money judgment against prison officials. *See Walker v. Schult et al*, No. 9:11cv287 (N.D.N.Y.).
[9] https://www.bop.gov/coronavirus/ (last visited June 5, 2020).
[10] Brooke Wolford, "Inmate who 'recovered' from coronavirus dies in California prison, officials say," *The Sacramento Bee*, May 28, 2020, available at https://www.sacbee.com/news/coronavirus/article243076476.html
[11] Chart created by the Federal Defenders of New York. https://federaldefendersny.org/ (last visited June 5, 2020).

While the rest of the country takes tentative steps toward reopening, the situation within BOP remains dangerous, with over two thousand active cases among inmates and staff.[12] And the absence of current cases in a facility is no guarantee of its safety. For example, on March 29, 2020, there were no cases at FCI Forrest City Low or FCI Elkton.[13] By April 11, there were 26 inmate cases at FCI Forest City Low and 10 inmate cases at Elkton FCI.[14] By May 2, those numbers had shot up, to 461 inmate cases at FCI Forest City Low and 429 cases at FCI Elkton.[15]

In addition, there is reason to question the BOP's reporting of cases. There were 1 inmate case and 7 staff cases reported at FCI Ray Brook on April 11.[16] On April 19, local press reported that six corrections officers and six inmates at FCI Ray Brook had the virus,[17] but the BOP reported no cases at all there.[18] On May 14, after the BOP began reporting the numbers of "recovered" inmates and staff, it reported that 11 inmates and 9 staff had recovered at FCI Ray Brook, numbers that do not appear to have changed since that time. Given the continued lack of widespread testing and the ease with which the virus spreads through asymptomatic or mildly symptomatic carriers, it is difficult to determine the true number of cases in an institution where the virus has circulated.

---

[12] https://www.bop.gov/coronavirus/ (last visited June 5, 2020).
[13] https://web.archive.org/web/20200329223908/https://www.bop.gov/coronavirus/
[14] https://web.archive.org/web/20200411150943/https://www.bop.gov/coronavirus/
[15] https://web.archive.org/web/20200502073139/https://www.bop.gov/coronavirus/ .The case numbers at Elkton and Forrest City have not changed since that time, suggesting that BOP is no longer tracking (or at least not publicly reporting) the number of cases at those facilities.
[16] *See* note 12, *supra.*
[17] "Seven inmates now ill with COVID-19 in Essex County," *North County Public Radio,* Apr. 19, 2020, available at https://www.northcountrypublicradio.org/news/story/41193/20200419/seven-inmates-now-ill-with-covid-19-in-essex-county
[18] https://web.archive.org/web/20200419165217/https://www.bop.gov/coronavirus/

The consequences of that inability to control the spread of the disease are clear. On April 3, the government opposed release in another case in this district, for an inmate at FCI Butner, citing all of the BOP's COVID-19 policies, such as screening, visitation lockdown, and social distancing, as being sufficient to prevent the spread of COVID-19 within Butner. *See United States v. Rumley*, No. 08-cr-5, Dkt. 185, at 4–7 (W.D. Va. Apr. 3, 2020). Despite those precautions, the inmate in question, Mr. Rumley, has now tested positive for COVID-19. *See Rumley*, No. 08-cr-5, Dkt. 202.

Indeed, a leading epidemiologist from John Hopkins University, Dr. Chris Beyrer, has stated under oath regarding COVID-19 that the "fatality rate is higher in men, and varies significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for those with pre-existing medical conditions including cardio-vascular disease, respiratory disease, diabetes, and *immune compromise*." (Declaration of Chris Beyrer, MD, MPH, in Support of Persons in Detention and Detention Staff, COVID-19, (hereinafter "Beyrer Decl."), attached hereto as Ex. B, at ¶ 6) (emphasis added).

As of December 2018, Congress invested this Court with the power and duty to consider reducing a limited number of its previous sentences where extraordinary circumstances, not foreseen at the time of sentencing, make such reconsiderations appropriate. Now, Section 3582(c)(1)(A) of Title 18 permits a defendant to file directly with the Court a motion seeking reduction of his or her sentence for extraordinary and compelling reasons if: (1) the defendant has fully exhausted his

administrative remedies or (2) there has been a lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A)(i). No longer is the Court divested of jurisdiction after sentencing a defendant. Upon the proper showing and in light of extraordinary circumstances this Court is permitted to release an inmate. Accordingly, upon consideration of Mr. Coleman's extraordinary and compelling showing below, this Court should act quickly and decisively to release him from custody and permit him to serve the remainder of his sentence in strict home detention in order to protect his health and rights.

Mr. Coleman is 44 years old, and has chronic uveitis, a history of hypertension, and a current case of viral pneumonia. *See* Ex. A. Like every person in this country, Mr. Coleman is in danger of contracting a pernicious, aggressive life-threatening infection—the COVID-19 virus. Unlike most people in this country, however, he has no way to practice the social distancing and sheltered protective measures that are mandated by governments and health officials throughout the nation and which promise some hope of surviving the consequences of infection. Indeed, he is prevented from such practices due to the living conditions in which he is incarcerated. And if he contracts the virus, his pre-existing medical conditions significantly increase the risk that severe complications, including death, will result. In addition, the COVID-19 pandemic is also preventing him from receiving necessary medical care within BOP, due to his facility's inability to deal with his complex medical issues during the outbreak. Addressing and alleviating the risk of such dangers are both prudent and compassionate without endangering others or

deviating unreasonably from the intent and purpose of the Court's original sentence for him.

Mr. Coleman made a request for compassionate release to the warden of FCI Ray Brook on April 15, 2020, seeking release because of his health issues, age, and the COVID-19 epidemic. *See* Ex. C, request to Warden and acknowledgement. Thirty days from the date of the request have now run, and accordingly, Mr. Coleman has exhausted his administrative remedies under 18 U.S.C. § 3582(c)(1)(A).

## I. **Extraordinary and compelling reasons warrant a reduction of Mr. Coleman's sentence under the First Step Act**

Under the First Step Act, courts may grant the direct request of prisoners to reduce their sentences if "extraordinary and compelling reasons" warrant such a reduction. See First Step Act of 2018, Section 603(b), Pub. L. 115-391, 132 Stat. 5194 (2018) (amending 18 U.S.C. § 3582(c)(1)(A)(i)). Courts in this district have used this authority to make such sentencing reductions in the context of the COVID-19 outbreak, finding "extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. Harper*, No. 7:18-CR-00025, 2020 WL 2046381, at *3 (W.D. Va. Apr. 28, 2020) (Dillon) citing *United States v. Feiling,* Criminal No. 3:19cr112 (DJN), 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020); *United States v. Dungee*, Case No. 7:15CR00005, 2020 WL 1666470, at *2 (W.D. Va. Apr. 4,

2020). The present case presents a perfect example of such "extraordinary and compelling reasons" as Mr. Coleman's underlying health conditions put him a particular susceptibility to COVID-19, and his incarceration at FCI Ray Brook puts him a particularized risk of suffering its consequences.

*A. Mr. Coleman is particularly susceptible to COVID-19*

Mr. Coleman suffers from multiple conditions that put him at an especially grave risk of harm.

Uveitis patients are at an increased risk from COVID-19 because they may require systemic immunosuppression to control the inflammation in their eyes, including using corticosteroids and other drugs.[19] Corticosteroids are immunosuppressive drugs that decrease inflammation by reducing the activity of the immune system.[20] Because steroid eye drops have proven ineffective, the next step in Mr. Coleman's treatment would be corticosteroid injections and/or pills,[21] which may be helpful against his uveitis, but at the cost of suppressing his immune system and making him more vulnerable to COVID-19. Uveitis patients also require frequent monitoring by providers, potentially exposing them through other patients and healthcare workers. [22]

But Mr. Coleman is also at risk from COVID-19 regardless of whether he contracts it, simply because the current pandemic conditions at FCI Ray Brook are

---

[19] Jennifer Hung, "Implications of COVID-19 for uveitis patients: perspectives from Hong Kong, *Nature*, Apr. 29, 2020, available at https://www.nature.com/articles/s41433-020-0905-1.
[20] Corticosteroids, https://my.clevelandclinic.org/health/drugs/4812-corticosteroids
[21] https://www.mayoclinic.org/diseases-conditions/uveitis/diagnosis-treatment/drc-20378739
[22] *See* Note 19, *supra.*

preventing him from receiving proper care for his eye condition. He has not yet seen an ophthalmologist, although he has lost most of the vision in his left eye, and it is not clear when he will be allowed to see one. The medication the prison is providing, the steroid eye drops, is not sufficient to remedy the problem, and there is reason for concern over the continued use of those drops without adequate monitoring. Durezol is also a corticosteroid,[23] and the use of steroid eye drops increases the risk of ocular hypertension.[24] Ocular hypertension has no symptoms, and is not apparent to outward inspection, but it places the patient at increased risk of glaucoma.[25] For this reason, "monitoring intraocular pressure of the patient is essential."[26] However, no monitoring of Mr. Coleman's intraocular pressure is being done at FCI Ray Brook, nor does it appear likely that any can be done until he is able to see an ophthalmologist.

Mr. Coleman is also at risk from COVID-19 because of his recent bout of viral pneumonia, from which he has still not recovered. Pneumonia is a leading cause of hospitalization and death worldwide,[27] and severe pneumonia can leave lungs so inflamed that they cannot function, placing the body at risk of organ failure and death.[28] Mr. Coleman's compromised lung function leaves him vulnerable to more severe consequences from COVID-19 should he contract it.

---

[23] https://www.webmd.com/drugs/2/drug-151208/durezol-ophthalmic-eye/details
[24] https://www.aoa.org/news/clinical-eye-care/daily-use-of-steroid-drops-increases-risk-for-ocular-hypertension
[25] What is ocular hypertension? *American Academy of Ophthalmology*, available at https://www.aao.org/eye-health/diseases/what-is-ocular-hypertension#:~:text=Ocular%20hypertension%20is%20when%20the,eye%20pressure%20can%20cause%20glaucoma. (last visited June 3, 2020).
[26] *Id.*
[27] https://journals.lww.com/ccejournal/fulltext/2020/04000/the_clinical_presentation_and_immunology_of_viral.17.aspx
[28] https://www.medicalnewstoday.com/articles/pneumonia-and-covid-19#relationship

11

In addition, Mr. Coleman reports that he is continuing to experience symptoms of pneumonia, more than a month after he was first diagnosed, but he has not received a follow-up chest x-ray or any additional treatment. While it may take time to recover from pneumonia, the fact that Mr. Coleman is continuing to experience symptoms may also be indicative of further complications such as lung abscess, acute respiratory distress, and respiratory failure.[29]

Finally, Mr. Coleman has a history of hypertension, as his records from the University of Virginia indicate. *See* Ex. A. In a recent CDC report about the hospitalization rates and characteristics of confirmed COVID-19 diagnoses, researchers found that 89.3% of the hospitalized adult patients studied had one or more underlying conditions, among the most common of which was hypertension (49.7%). Garg S, Kim L, Whitaker M, et al. Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020. MMWR Morb Mortal Wkly Rep 2020;69:458–464. DOI. available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm?s_ cid=mm6915e3_w (updated April 17, 2020). Similarly, the New York State Health Department tracks the state's fatalities by age group and comorbidity, and hypertension was in the top ten comorbidities.[30]

---

[29] https://www.lung.org/lung-health-diseases/lung-disease-lookup/pneumonia/treatment-and-recovery
[30] https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n#/views/NYS%2dCOVID19%2dTracker/NYSDOHCOVID%2d19Tracker%2dFatalities?%253Aembed=yes&%253Atoolbar=no&%253Atabs=n.

As the CDC studies above note, there is a strong correlation between a history of hypertension and severe cases of COVID-19. One explanation may again relate to the link between COVID-19 and inflammation: the coronavirus appears to cause inflammation of the heart muscle, and certain blood pressure medications may make patients more susceptible to this kind of inflammation.[31]

Mr. Coleman thus has a constellation of serious health conditions that place him at risk. Under normal, pre-COVID-19 circumstances, all would be manageable in a prison setting with careful monitoring and prompt attention. Under the present circumstances, however, Mr. Coleman faces a serious risk of permanent disability, grave illness, and death because of the impact of a COVID-19 infection on someone with his preexisting conditions, as well as the limitations the COVID-19 epidemic has placed on medical care at FCI Ray Brook.

Courts have recognized that inmates with difficult-to-manage chronic conditions may qualify for compassionate release. *See, e.g., United States v. Norris,* — F. Supp. 3d —, 2020 WL 2110640 (E.D.N.C. Apr. 30, 2020) (defendant with life threatening contagious disease, kidney failure requiring dialysis three times a week, and multiple bouts of pneumonia received compassionate release); *United States v. Harper,* No. 7:18cr25 ECF 64 (W.D. Va. Apr. 28, 2020) (defendant with COPD, emphysema, and asthma granted compassionate release).

Courts have also granted compassionate release to inmates whose health is plainly deteriorating in BOP care and who face additional risks due to the COVID-

---

[31] https://www.health.harvard.edu/blog/how-does-cardiovascular-disease-increase-the-risk-of-severe-illness-and-death-from-covid-19-2020040219401

19 pandemic. *See, e.g., United States v. Hammond*, CR 02-294 (BAH), 2020 WL 1891980, at *1 (D.D.C. Apr. 16, 2020) (granting compassionate release to a defendant with "recently resurgent prostate cancer" and recognizing that the defendant's age, "deteriorated health," and need to avoid COVID-19 exposure warranted compassionate release); *United States v. Smith,* 2020 WL 2844222 (N.D. Iowa June 1, 2020) (defendant was diagnosed with lung cancer and his "health has deteriorated during his incarceration," given that "BOP medical officials had reason to suspect Smith's cancer for two years prior to treatment.")

Finally, courts have recognized that immunocompromised defendants are at particular risk from COVID-19. *See, e.g., United States v. Peters*, 2020 WL 2092617 (D. Ct. May 1, 2020) (granting compassionate release to 39 year old defendant whose underlying medical conditions left him immunocompromised); *United States v. Campagna,* -- F. Supp. 3d --, 2020 WL 1489829 (S.D.N.Y. March 27, 2020) (granting compassionate release in light of 55 year old's "compromised immune system" in concert with the COVID-19 crisis).

Here, Mr. Coleman's eye condition has received only minimal attention from BOP and as a result he has lost almost all vision in that eye. Given sufficient access to ophthalmologists, testing, and monitoring, Mr. Coleman's condition could certainly be treated by BOP medical staff, but those are in short supply during the pandemic within a level 1 BOP facility. To make matters worse, Mr. Coleman's eye drops also pose a risk to him, given the lack of monitoring of his intraocular pressure. And the treatment that it appears he should be receiving—steroid

injections or pills, or other immune suppression treatments to reduce inflammation—would certainly put him at greater risk from COVID. His pneumonia and history of hypertension further exacerbate those risks.

*B. Mr. Coleman is at particular risk of COVID-19 at FCI Ray Brook*

The COVID-19 virus has spread with alarming ease within BOP facilities, despite efforts by the BOP to check its progress. Currently, the infection rate within BOP is over six times the national infection rate within the United States. *See* table, below.[32]



While the BOP is reporting no current cases at FCI Ray Brook, the ease with which the virus has spread throughout BOP facilities strongly suggests that no place is safe. Courts have recognized as much: in *United States v. Feucht,* -- F. Supp. 3d --, 2020 WL 2781600 (S.D. Fla. May 28, 2020), the court recognized that "zero *confirmed* COVID-19 cases is not the same thing as zero COVID-19 cases" at FCI

---

[32] *See* https://federaldefendersny.org/ (last visited June 4, 2020)

Jesup, where the defendant was housed, and granted compassionate release. *See also United States v. Atkinson*, No. 2:19-CR-55 JCM (CWH), 2020 WL 1904585, *2-4 (D. Nev. Apr. 17, 2020) (granting compassionate release to the defendant, notwithstanding that FCP Atwater where he was housed had seen no cases of COVID-19 because the realities of prison life made it impossible for medically vulnerable inmates like Mr. Atkinson to follow CDC guidelines to protect themselves in the face of COVID-19); *United States v. Amarrah*, 2020 WL 2220008 (E.D. Mich. May 7, 2020) (releasing medically vulnerable inmate from FCI Loretto, despite no reported COVID-19 cases at the facility, because he could not adequately protect himself in line with CDC guideline). In addition, as noted above, the category "recovered," as defined by BOP, is a relatively unstable one, given that "recovered" inmates may still die of COVID-related complications. Thus, Mr. Coleman remains at particular risk from contracting COVID-19 at FCI Ray Brook.

## II. A sentence of time served is sufficient to accomplish the goals of sentencing

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Under all of the circumstances in this case, the Court should conclude that the time that Mr. Coleman has already served is sufficient to satisfy the purposes of sentencing. Under *Pepper v. United States*, 562 U.S. 476, 492 (2011), the Court can, and indeed must, consider "the most up-to-date picture" of the defendant's history and

characteristics, which "sheds light on the likelihood that [the defendant] will engage in future criminal conduct."

Here, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents. Although the circumstances of the present offense qualified Mr. Coleman for the serious sentence that this Court originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness or permanent disability. Mr. Coleman is at grave risk should he remain incarcerated, and he should have the benefit of social distancing in an environment that avoids the direct risk of COVID-19 exposure he currently faces.

Mr. Coleman is not a danger to the community. While he has a substantial criminal history, most of it is over ten years old, and he has no convictions for any violent crimes. Indeed, much of the offense conduct, and the vast majority of the drug weight, described in the PSR dates from the 2009-2011 timeframe. Despite guidelines that recommend a sentence of 235 to 293 months, the government offered him a plea to a range of 84 to 120 months under Rule 11(c)(1)(C), suggesting that the government agreed that there were factors in his case warranting a below-guidelines sentence.

The fact that Mr. Coleman has not yet passed the halfway point in his sentence does not bar him from compassionate release. Indeed, courts have granted it in cases where defendants have served a far smaller percentage of their sentence than Mr. Coleman has. For example, in *United States v. Delgado*, -- F. Supp. 3d --,

17

2020 WL 2464685 (D. Ct. Apr. 30, 2020), the court granted compassionate release to a defendant who had served approximately 29 months of a 120 month sentence for distribution of over 5 kilograms of cocaine under 21 U.S.C. § 841(b)(1)(A).

He has been incarcerated on this case or related charges since April 2017, and his projected release date is in July 2024. Ex D. Thus, while he has not yet reached the halfway point in his sentence, he does not have far to go, given good time credit. In addition, BOP calculates that he will be eligible for home detention in January 2024. Thus, of the 6 years and 9 months he may be expected to serve within BOP, he has already served almost half, at 3 years and 2 months. He has no disciplinary history, and has sought to improve himself while in BOP, as he is on the waiting list for drug treatment classes and parenting classes. Ex. D.

Mr. Coleman has a reasonable release plan. Upon release, he plans to live with his fiancée Shavonne Jordan in Brooklyn, New York. He and Ms. Jordan have been together for approximately 8 years, and she has an apartment there in which he can self-quarantine. Mr. Coleman has also been treated for his uveitis by doctors at Mt. Sinai Hospital in New York City in the past, and thus will have ready access to specialists who are familiar with his condition. Mr. Coleman is a published author,[33] and is working on a second novel, an employment well-suited to home confinement and self-quarantine.

By the same token, Mr. Coleman asks the Court to permit him to spend any 14 day quarantine period upon release in home detention, rather than in Bureau of

---

[33] https://www.amazon.com/Gangstas-Dont-Die-Mouse/dp/0981598005

18

Prisons. As the government recently admitted in another case in this district, *United States v. Stevens*, inmates like Mr. Coleman have been in "effective quarantine" for weeks now in Bureau of Prisons. Several judges in this district have now released defendants to self-quarantine at home. *See, e.g., United States v. Stevens*, 1:08-cr-15 (Order May 6, 2020); *United States v. Tinsley*, No. 3:12-cr-20 (Order April 28, 2020); *United States v. Harper*, No. 7:18-cr-25 (Order April 28, 2020).

### Conclusion

For these reasons, Mr. Coleman asks this Court to enter an order granting him immediate release on conditions of home confinement and reducing his sentence to time served. Extraordinary and compelling reasons warrant reduction of Mr. Coleman's sentence, as both his underlying health conditions and the situation in BOP and at FCI Ray Brook put him at grave risk from COVID-19. A sentence of time served, followed by a period of home confinement for the remainder of his incarceration, is sufficient but not greater than necessary to meet the goals of sentencing.

Respectfully submitted,

JERMEL COLEMAN
By counsel

Counsel:
/s/ Erin Trodden
Erin Trodden
Asst. Federal Public Defender VSB 71515
116 N. Main St., Room 305
Harrisonburg, VA 22802
Tel (434) 220-3396
Counsel for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: counsel of record; and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: none.

/s/ Erin Trodden